Filed 2/26/13  P. v. Trujillo CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JACOB ROY TRUJILLO,<br><br>    Defendant and Appellant. | F063616<br><br>(Super. Ct. No. VCF241469)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Gary L. Paden, Judge.

Deborah L. Hawkins, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Michael A. Canzoneri and Barton Bowers, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Jacob Roy Trujillo was found guilty of a total of four acts of molestation against two child victims.  With sentence enhancements for a prior strike, among other things, he received a determinate sentence of 13 years plus an indeterminate

sentence of 60 years to life. In this appeal, Trujillo argues that the convictions on two of the counts were not supported by sufficient evidence. He also argues that, of six witnesses who gave propensity testimony under Evidence Code section 1108, two should have been excluded. We disagree and affirm the judgment.

### FACTUAL AND PROCEDURAL HISTORIES

The district attorney filed an information on January 5, 2011, charging Trujillo with four counts: (1) a lewd act upon J.V., a child under 14, consisting of kissing her using his tongue (Pen. Code, § 288, subd. (a));[1] (2) communicating with J.V. (by discussing sex with her) with intent to commit an enumerated sex offense[2] (§ 288.3, subd. (a)); (3) a lewd act upon M.H., a child under 14, consisting of touching her vaginal area (§ 288, subd. (a)); and (4) oral copulation with the vagina of M.H., a child under 10 (§ 288.7, subd. (b)). For sentence-enhancement purposes on all counts, the information alleged a prior strike (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)) and a prior serious felony (§ 667, subd. (a)(1)), both based on a first degree burglary (§ 459) of which Trujillo was convicted in 1990. On counts 1 and 3, the information alleged a multiple-victim special circumstance. (§ 667.61, subd. (b).)

Trujillo owned a property in Pixley with three houses. He lived in one and rented one to the family of M.H. M.H.'s father testified at trial that on April 13, 2009, when M.H. was five years old, she came in from outside and told him Trujillo "licked her down there." She said she told him to stop and she was going to tell her father.

Trujillo was a long-haul trucker and kept his truck, which had a sleeping area in the cab, parked on the property. M.H. testified at trial that Trujillo gave her and her brothers some candy. Her brothers then went away, leaving M.H. alone with Trujillo. He

---

[1]Subsequent statutory references are to the Penal Code unless otherwise noted.

[2]The jury was instructed that the enumerated offense it had to find an intent to commit was section 288, subdivision (a), a lewd act upon a child under 14.

also gave her a big teddy bear. Then M.H. was in Trujillo's truck with him, on the bed. He touched her with his lips. She demonstrated where he touched her by circling the crotch on a diagram of a girl. Trujillo told her not to tell her father. This incident was the basis of counts 3 and 4 of the information.

M.H.'s brothers, who were 10 and 12 at the time of trial, testified. They said Trujillo gave chocolate bars to all three siblings that day. He gave a fourth chocolate bar to the older brother and told him to take it to their father. The boys went in their house to take the candy to their father, while M.H. remained with Trujillo.

After hearing what happened, M.H.'s father called the police and went with M.H. to confront Trujillo. Trujillo's wife asked M.H., "Who hurt you?" M.H. replied, "Jacob and Dillon," referring to Trujillo and a cousin of M.H.'s father. On cross-examination, M.H. testified that Dillon once pulled down his pants and her pants and did "something nasty" to her in a closet.

M.H.'s father called M.H.'s mother, who came home from work. The mother testified that when she got home, M.H. was scared, thought she was in trouble, had her head down, and was crying and sad.

A sexual assault nurse examiner swabbed M.H.'s inner thighs, mouth, and genitals. DNA testing of one of the inner thigh samples revealed two profiles, one of M.H.'s own DNA and one belonging to a male. Trujillo's DNA profile matched that of the male contributor. The profile matched one in 4.8 billion Hispanics, 1 in 2.7 billion Caucasians, and 1 in 11.9 billion African Americans. It was impossible to determine what sort of fluid or tissue the DNA came from. It was possible that the DNA had been transferred to M.H.'s thigh without contact between her and Trujillo as, for instance, through contact between M.H. and surfaces inside the truck on which Trujillo had sat. Testing of M.H.'s underwear also revealed male DNA, but the sample was too small for further identification.

J.V., born in May 1999, and 12 years old at the time of trial, is Trujillo's granddaughter, the daughter of Trujillo's daughter K.T. J.V. testified at trial about events that took place during two visits with Trujillo. The first visit was around 2005, when J.V. was six, but could have been a year earlier or a year later. J.V. and her family were staying with Trujillo for Thanksgiving at Trujillo's house in Arizona. J.V. testified that she was sleeping in a bedroom and woke up in the morning and went into the living room. Her mother was asleep in the living room. Trujillo was lying on the living room floor. He told J.V. to lie down next to him. Then he put his hand under her pajama pants and into her underpants and touched her "private spot." "'Does that feel good?'" he asked. J.V. did not tell anyone about this at the time because she did not know whether it was right or wrong and did not want to get Trujillo in trouble.

The second visit was in June or July of 2008, when J.V. was nine. Trujillo was then living in Pixley. Trujillo drove to Santa Clara, where J.V.'s family lived, and picked up J.V. and her younger sister. The two girls stayed with Trujillo for about a month. One night, J.V. was lying awake in bed when Trujillo came into the room where J.V. and her sister slept. J.V. pretended to be asleep. Trujillo's dog was with him and Trujillo was talking on the phone. He stopped talking and picked J.V. up, cradling her like a baby. Then he kissed J.V. on her lips. J.V. testified that "it was not like in the tongue but it was only like a regular kiss and that's it." J.V. did not remember telling an interviewer that she felt Trujillo's tongue. After Trujillo left the room, J.V. woke up her sister and said she was scared, did not know what to to, and wanted to go home. The jury watched a video recording of an interview J.V. gave as part of the police investigation on January 20, 2010. J.V. told the interviewer that Trujillo kissed her on the lips "[w]ith his tongue in my mouth." This incident was the basis of count 1 of the information.

Later during the same visit, Trujillo asked J.V.'s sister if she had changed her underwear. The sister said no. K.T. testified that when her daughters were small, she did not insist they change their underwear every day. Trujillo then put his hand inside J.V.'s

4.

pants and underwear, touched her genitals, withdrew his hand, and said, "'Well do you want to smell like this?'"

Still later during the 2008 visit, J.V. was in Trujillo's room and Trujillo told her to lie down on the bed. She did, and he lay down beside her, on top of her arm. He said, "'Do you want to know about sex[?]'" She said no, but he began speaking anyway. J.V. testified, "I think he said that a boy goes under the girl and they lay on top of each other and that's when they make a baby and that's all I think I remember." J.V. also testified, "I felt like he was telling me something that he wasn't supposed to so I got kind of, like I was kind of like I didn't feel like a regular person would feel like." This incident was the basis of count 2 of the information. J.V. told her mother about all three incidents when she returned home.

Relying on Evidence Code section 1108, the People presented evidence that Trujillo molested six other girls over the course of his life. One was R.H., Trujillo's sister. Trujillo, who was 57 at the time of trial, was nearly eight years older than R.H. R.H. testified that, at some time before she was old enough for school, Trujillo made her lie down in a closet in their house. She said he was "on top of me and you know like moving and stuff and, the weight of his body being quite suffocating and I had to use the restroom and he wouldn't let me get up. He had told me to just pee in the closet and so I did and peed through my clothes and everything." After being shown an interview transcript to refresh her memory, R.H. testified that during this incident, Trujillo touched her vaginal area over her clothes. There were other incidents after she started school, at the age of five or six, when he lay on top of her and "would be moving around and stuff." She said Trujillo "would touch and everything like to you know situate himself," and "would also situate you know like my hips and stuff." R.H. testified that in general, Trujillo "was very abusive growing up."

Another witness who testified about prior incidents of molestation was K.S. K.S. was about a month older than R.H. Between the ages of six and nine and a half, K.S.

5.

lived with Trujillo's family as a foster child. When K.S. was eight or nine and Trujillo was in high school or junior high school, Trujillo began having sexual intercourse with her against her will. While his parents were at work, he would order her to go into his parents' bedroom "and then he would have sex with me and stuff like that and fondle me." She remembered that during intercourse, "his pubic hairs would touch my bare skin around the vagina" and this was uncomfortable. Trujillo forced K.S. to have intercourse "lots of times" when she was between the ages of eight and nine and a half. It made her feel dirty, but she did not tell anyone for a time because she thought she would not be believed. When she was nine and a half, K.S. revealed the molestation to her teacher. She was examined by a doctor that day and permanently removed from the foster care placement with Trujillo's family.

C.M. and B.M. were daughters of Trujillo's mother's live-in boyfriend. E.M. was a half-sister of C.M. and B.M. When E.M. was nine and Trujillo was around 39, he placed her in front of him on the seat of a motorcycle and took her for a ride around the block. As he drove, he put his finger on her vagina, on the outside of her clothes, and kept it there for about a minute. E.M. was scared and did not mention this to anyone. On another occasion, Trujillo ordered E.M. to take her shirt and bra off so he could look at her breasts. She said no at first, but Trujillo persisted and she complied. When E.M. was 12, she went with Trujillo in a van to run an errand to a store for Trujillo's mother-in-law. Before going to the store, Trujillo drove out into the country, stopped, and took E.M. to the back of the van. He told her to pull her pants down. When she did, he put his finger in her vagina and asked if it felt good. She did not answer. He said that if his mother-in-law asked why they took so long going to the store, she should say there was a long line. E.M. never told anyone of the incident.

Later, E.M. went to a bank with her stepmother (Trujillo's mother) and Trujillo in the van. While the stepmother was inside the bank, Trujillo called E.M. up to the front seat with him, took his penis from his pants, and told her to stroke it. She did so one time

6.

and returned to the back of the van. E.M. testified that there were many other occasions between the time she was nine and the time she was 15 when Trujillo touched her vagina through her underwear. When she was staying with her stepmother, Trujillo would sometimes come into the room where she was sleeping and touch her. Other times, he did it while she was lying on the living room floor.

B.M. testified that from the time she was six to the time she was between 13 and 15, she and C.M. lived with their father and Trujillo's mother. Trujillo, who was an adult, did not live there, but visited. At least once during this time, Trujillo touched B.M. and C.M. He touched B.M.'s vagina area. She was disgusted and scared and did not tell anyone. Later, when B.M. was 16, Trujillo came to B.M.'s house to take her shopping. During the outing, he touched her leg and stomach.

C.M. testified that she began visiting her father and Trujillo's mother when she was around nine. During one visit when C.M. was nine, after C.M. and B.M. had taken showers and were wrapped in towels, Trujillo, then an adult, came into the bathroom and told them to take off their towels so he could see them. C.M. screamed and Trujillo left. Later, after Trujillo's mother moved to Pixley and C.M. was 11 or 12, C.M. and B.M. were sitting on a couch at Trujillo's mother's house. Trujillo sat between them and said to C.M., "'Why haven't you developed like your sister did[?]'" Trujillo tried to touch C.M.'s chest, but she moved away.

Finally, S.B. testified. S.B. is the half-sister of Trujillo's daughter. When she was about six, her family visited Trujillo. During the visit, Trujillo put a pornographic video on the television and told her to sit in front of the television and watch. No one else was in the house.

Trujillo testified in his own defense. He said that on April 13, 2009, one of M.H.'s brothers was squirting her and the other brother with a squirt gun. Trujillo invited M.H. and one brother to sit with him so the other brother would stop squirting. M.H. sat on his knee. Then he got some candy bars from his truck and gave one to each of the children

7.

and an extra one for their father. The boys went away and M.H. stayed in the truck for a little while. Then he helped her get out, and noticed that she smelled like urine. He asked if she wet herself, and she said no. He said he never touched her inappropriately. M.H. was mad at him because he did not buy her a toy she wanted.

Trujillo denied that he touched J.V. inappropriately during the 2005 Thanksgiving visit. He kissed her during the 2008 visit, but it was an innocent good-night kiss. He did not put his tongue in her mouth. He was talking on the phone and his wife was present. Trujillo admitted he talked to J.V. about sex, but said he did so because J.V. told him she had seen her mother naked in bed with a man. After he began, J.V. said she did not want to hear any more, and he stopped.

Trujillo testified that R.H., K.S., E.M., B.M., C.M., and S.B. all lied in their testimony. He never did any of the things they alleged. Trujillo was involved in an ongoing dispute with R.H. over their mother's estate.

Trujillo's wife, Maria Trujillo, testified for the defense. She said that when M.H.'s father brought M.H. to the Trujillos' house on April 13, 2009, and she asked M.H. who touched her, M.H. said Dillon had done it and denied that Trujillo had. Maria said it was her idea and Trujillo's to call the police. M.H. was calm. Maria never saw Trujillo touch J.V. inappropriately. J.V. acted normally during the 2005 Thanksgiving visit. The 2008 visit was extended because J.V. and her sister wanted to stay longer. Maria never heard any previous complaints about Trujillo by any of the girls and women who testified against him.

Valentino Burnias, Maria's son, was present during the 2005 Thanksgiving visit. He testified that he never heard J.V. complain that Trujillo had touched her inappropriately, and J.V. never appeared to want to avoid Trujillo. Burnias also was present on occasions when E.M. visited Trujillo. E.M. did not appear to him to be afraid of or to want to avoid Trujillo, and he never heard her make any statements about inappropriate behavior on Trujillo's part.

8.

The defense called John Lee, an investigator for the district attorney's office, to testify. Lee said he looked in Trujillo's truck and did not find a teddy bear.

The defense presented a DNA expert. He testified that he had no disagreement with any of the results or conclusions of the reports prepared for the prosecution by the Department of Justice. He stated that, although all the male DNA found on M.H.'s thigh matched Trujillo's profile, the sample did not generate a full DNA profile, so there was "not a match, a concrete match to a specific male." Still, "Trujillo cannot be excluded as a possible contributor of" the sample.

The jury found Trujillo guilty as charged. It found the multiple-victim allegations true. The court found the prior-conviction allegations true.

The court imposed consecutive terms of 30 years to life on counts 1 and 3. These were the two lewd acts on victims under 14 (§ 288, subd. (a))—kissing J.V. using his tongue and touching the vaginal area of M.H.—which, with the multiple-victim special circumstance, each carried a term of 15 years to life (§ 667.61, subds. (b), (c)(8), (e)(4)), which was doubled because of the prior strike (§ 667, subd. (e)(1)). On count 2, communication with J.V. with intent to commit a sex offense (§ 288.3), the court imposed the upper term of four years, doubled for the prior strike, plus five years for the prior serious felony (§ 667, subd. (a)(1)), a total of 13 years, consecutive to the sentences on the other counts. On count 4, oral copulation of M.H. (§ 288.7, subd. (b)), the court applied section 654 to stay a term of 30 years to life, calculated as 15 years to life because of the multiple-victim special circumstance, doubled because of the prior strike.

## DISCUSSION

### I.    Evidence Code section 1108

Trujillo argues that the court violated his due process right to a fair trial by admitting "excessive" propensity evidence under Evidence Code section 1108. Specifically, he asserts that the court was required to exclude the testimony of K.S. and S.B. We conclude that the court acted within its discretion in admitting this testimony.

9.

(*People v. Waidla* (2000) 22 Cal.4th 690, 717 [abuse of discretion standard governs review of trial court's rulings on admissibility of evidence].)

With certain exceptions, Evidence Code section 1101 provides that "evidence of a person's character or a trait of his or her character … is inadmissible when offered to prove his or her conduct on a specified occasion." (Evid. Code, § 1101, subd. (a).) Evidence Code section 1108 establishes one of the exceptions. It states: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to section 352." (Evid. Code, § 1108, subd. (a).)

Evidence Code section 1108 was enacted in 1995 because the "Legislature … determined that the policy considerations favoring the exclusion of evidence of uncharged sexual offenses are outweighed in criminal sexual offense cases by the policy considerations favoring the admission of such evidence. The Legislature … determined the need for this evidence is 'critical' given the serious and secretive nature of sex crimes and the often resulting credibility contest at trial. [Citation.]" (*People v. Fitch* (1997) 55 Cal.App.4th 172, 181-182, fn. omitted.) Because "'the willingness to commit a sexual offense is not common to most individuals,'" the Legislature concluded that "'evidence of … prior sexual offenses is particularly probative and necessary for determining the credibility of the witness.' [Citation.]" (*People v. Soto* (1998) 64 Cal.App.4th 966, 983.)

Our Supreme Court has held that evidence admitted in conformity with Evidence Code section 1108 does not violate a defendant's due process rights. (*People v. Falsetta* (1999) 21 Cal.4th 903, 915 (*Falsetta*).) Trujillo's due process challenge, therefore, depends only on whether the trial court acted within its discretion in admitting the testimony of K.S. and S.B. under Evidence Code section 1108.

As Evidence Code section 1108 provides, propensity evidence in the form of prior sex offenses is admissible only if it is not unduly prejudicial under Evidence Code

section 352. Evidence Code section 352 provides that a trial court may exclude evidence the probative value of which is substantially outweighed by its likely prejudicial effect. Explaining the application of Evidence Code section 352 in the context of evidence deemed admissible by Evidence Code section 1108, the Supreme Court in *Falsetta* stated:

> "Rather than admit or exclude every sex offense a defendant commits, trial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense. [Citations.]" (*Falsetta, supra*, 21 Cal.4th at p. 917.)

The Supreme Court went on to explain that convictions of the prior offenses and similarities between the charged and uncharged offenses were particularly good indicators of the probative value of prior crime evidence. (*Falsetta, supra*, 21 Cal.4th at p. 917.)

In this case, the trial court did not admit every prior sex offense proffered by the prosecution. The prosecution sought to present 12 propensity witnesses under Evidence Code section 1108. The court excluded four of these, stating: "I did a balancing test. I excluded four of these potential 1108 witnesses much to the dismay of [the prosecutor] because I did not feel that they were probative on the issues here given the fact that some of them involved some violent conduct which I thought would be highly prejudicial to Mr. Trujillo .…" Of the remaining eight witnesses, the prosecution chose to present the six whose testimony we have described.

Trujillo first asserts that the trial court "failed to analyze some important Falsetta factors when it admitted the [S.B.] and the [K.S.]." As the People observe, however, there is no requirement that the court state on the record the factors it has considered or the weight it has given them. Rejecting a similar argument that a trial court had not stated adequate reasons for its ruling on an Evidence Code section 352 dispute, the Supreme

11.

Court stated: "[W]hen ruling on a section 352 motion, a trial court need not expressly weigh prejudice against probative value, or even expressly state it has done so. All that is required is that the record demonstrate the trial court understood and fulfilled its responsibilities under … section 352." (*People v. Williams* (1997) 16 Cal.4th 153, 214.) Since Trujillo's challenge to the admission of propensity evidence under Evidence Code section 1108 essentially claims the evidence failed the test of Evidence Code section 352, the same principle applies here. It is clear that the court understood the analysis it was required to undertake under Evidence Code section 1108.

Trujillo also contends that the K.S. and S.B. testimony should have been excluded because of dissimilarity and remoteness. K.S. was the only victim who claimed Trujillo forced her to have sexual intercourse, while S.B. did not claim Trujillo touched her at all, but instead made her watch a pornographic video. The incident with S.B. was said, in counsel's arguments during a hearing on admissibility, to have taken place in the 1970's. The offenses against K.S. happened more than 40 years ago, and Trujillo was a minor at the time.

In spite of these differences, the court could, within the bounds of reason, find the evidence of prior offenses against K.S. and S.B. admissible. Both were relevant to Trujillo's propensity to engage in sexually aggressive behavior against very young girls. This made them sufficiently similar to the charged offenses. They were remote in time, but their remoteness in this instance did not support the proposition that they were aberrations, for the evidence as a whole illustrated Trujillo's propensity at numerous points over the course of his lifetime.

Trujillo also argues that K.S.'s testimony should not have been admitted because "[t]here was evidence that her claims were not true," referring to the fact that she reported the abuse at the time and Trujillo was not charged. The possibility that allegations of prior offenses are false does not, however, necessarily mean evidence of those offenses is inadmissible under Evidence Code section 1108. *Falsetta* stated that the degree of

certainty of a prior offense's commission is one factor that must be considered, not that the evidence must be excluded unless some quantum of certainty is attained. Here, there could be many reasons why Trujillo was not charged. The degree of certainty of his commission of offenses against K.S. was not so low that her testimony was inadmissible as a matter of law.

For these reasons, we cannot say the court abused its discretion. Trujillo has not established a due process violation.

## II.    *Sufficiency of evidence of offenses against J.V.*

Trujillo maintains that the evidence was not sufficient to prove that he kissed J.V. using his tongue (count 1, § 288, subd. (a)) or that he communicated with J.V. with intent to commit a lewd act (count 2, § 288.3, subd. (a)). We disagree.

The standard of review for a challenge to the sufficiency of the evidence supporting a conviction is well-established:

> "'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] A reviewing court neither reweighs evidence nor reevaluates a witness's credibility. [Citation.]' [Citation.]" (*People v. D'Arcy* (2010) 48 Cal.4th 257, 293.)

There was sufficient evidence to establish count 1. To violate section 288, subdivision (a), an act must be done "with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of [the defendant] or the child …." In the videotaped interview viewed by the jury, J.V. stated that Trujillo placed his tongue in her mouth when he kissed her while she was staying at his house in Pixley in 2008. The

13.

conclusion that Trujillo did this with the necessary state of mind was supported by the nature of the act and by J.V.'s testimony about Trujillo's sexually abusive behavior toward her on other occasions, including the 2005 incident in which he touched her vagina under her clothes and told her not to tell anyone. The jury's finding also was supported by the propensity evidence properly admitted under Evidence Code section 1108.

Trujillo's argument that the evidence was insufficient for this count is based on J.V.'s trial testimony contradicting her interview statement and on Trujillo's own testimony that he gave J.V. an innocent goodnight kiss while holding a telephone and in the company of his wife and his dog. The jury, however, could reasonably conclude that J.V.'s interview statement was the more reliable, as it was closer in time to the event and could reasonably disbelieve Trujillo's testimony.

There also was sufficient evidence to establish count 2. The prosecution was required to prove that Trujillo communicated with a minor with the intent to commit a lewd act. J.V. testified that in 2008, Trujillo told her to lie on a bed, then proceeded to lie on her arm and explain sexual intercourse to her even though she told him to stop. Again, from the nature of this act and from the other evidence of Trujillo's sexual abuse of very young girls, the jury reasonably could infer that Trujillo's intent in doing this was not innocent. Trujillo points out that J.V. herself testified that she thought Trujillo was giving her information for when she grew up, but the jury could reasonably find that a child's guileless interpretation failed to recognize Trujillo's true intention.

For these reasons, we conclude that Trujillo has not shown that the evidence was insufficient to prove counts 1 and 2.

## *DISPOSITION*

The judgment is affirmed.

_____
Wiseman, Acting P.J.

WE CONCUR:


_____
Cornell, J.


_____
Detjen, J.

15.